IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-690

Filed 5 March 2025

Gaston County, No. 16 CRS 055300

STATE OF NORTH CAROLINA

v.

EDUARDO JORGE ROJAS

Appeal by defendant from judgment entered 14 September 2023 by Judge Steve R. Warren in Superior Court, Gaston County, No. 16 CRS 055300. Heard in the Court of Appeals 28 January 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General T. Hill Davis III, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Katherine Jane Allen, for defendant.*

FREEMAN, Judge.

Eduardo Jorge Rojas ("defendant") appeals his aggravated sentence of 397 to 489 months imprisonment entered and based on his conviction for second-degree murder. Defendant contends the sentencing judge erred in failing to find the statutory mitigating factor that "[t]he defendant was suffering from a mental or physical condition that was insufficient to constitute a defense but significantly reduced the defendant's culpability for the offense." N.C.G.S. § 15A-1340.16(e)(3) (2023). After careful review, we conclude the sentencing judge did not err in refusing

to find this mitigating factor and we affirm defendant's resentencing.

## I.  Background

A complete recitation of the facts relevant to defendant's trial and initial sentencing can be found in this Court's prior opinion in this matter. *See State v. Rojas*, No. COA20-810, 2021 WL 5066762 (N.C. Ct. App. Nov. 2, 2021). Because this appeal concerns only defendant's resentencing, a brief overview of the background will suffice.

On 5 May 2016, defendant murdered his girlfriend, Amoritta Starr Costner, and left her body in a bathtub at their shared home. The victim's autopsy revealed 112 stab wounds, 49 cutting wounds, and several blunt trauma injuries. Defendant inflicted these wounds all over the victim's body—including her face, head, neck, wrists, hands, chest, back, stomach, and buttocks—using multiple different weapons.

Three of the numerous stab wounds to the victim's neck nicked her jugular vein and carotid artery. These wounds were fatal, but not immediately so; the victim bled to death over the course of several minutes. According to the responding Crime Scene Investigator, who has processed over 1,000 crime scenes, "[t]his one was the worst as far as I've ever seen, as far as the amount of wounding . . . [t]his is one that never leaves the memory."

After murdering the victim, defendant "contacted his mother to come to his house, pick him up, and take him to the hospital." *Rojas*, 2021 WL 5066762, at *1. Defendant's "clothes were bloody and bleach-stained, and he smelled of bleach." *Id.*

(cleaned up).  After defendant refused to go inside to change his clothes, his mother

transported him to a nearby hospital.  *Id.*  Defendant's mother then returned to the

home where she discovered the victim's body.  *Id.*  Upon defendant's discharge from

the hospital, he was arrested and charged with murder.  *Id.*

> After initially being found incapable of proceeding to trial due to psychotic disorders, Rojas received psychiatric hospital care. In three follow-up evaluations over several years, experts found him "barely" competent to stand trial but in a "precarious" situation that would require re-evaluation, particularly once Rojas confronted the stress of a trial. After his final evaluation, more than a year passed before Rojas pleaded guilty to second degree murder and then proceeded to a [bench] trial on the sentencing factors without any follow-up evaluation.
>
> . . .
>
> After hearing the evidence, the trial court found two aggravating factors. First, the court found that Rojas took advantage of a position of trust or confidence. Second, the court found that the offense was especially heinous, atrocious, or cruel. The court found that the mitigating factors offered by Rojas were present but were outweighed by the two aggravating factors. The court sentenced Rojas to an aggravated range sentence of 397 to 489 months in prison.

*Id.* at *1–3.

In his first appeal, defendant argued that the trial court erred "by failing, on

its own initiative, to conduct a competency hearing before the sentencing proceeding

because there was substantial evidence before the court that raised questions about

his competency." *Id.* at *3.[1] This Court agreed with defendant's argument, vacated his criminal sentence, and remanded "for the trial court to conduct a new sentencing proceeding after first evaluating Rojas's capacity to proceed." *Id.* at *4.

On 21 August 2023, after a hearing before Judge Robert. C. Ervin, the trial court on remand found "based upon the most recent evaluation" defendant was "mentally competent and capable of proceeding" with a new sentencing proceeding. The new sentencing proceeding took place on 13 and 14 September 2023 before Judge Steven R. Warren in Gaston County Superior Court.

At the sentencing hearing, defendant presented testimony from Dr. Sherif Soliman, a forensic psychiatrist. Dr. Soliman testified on direct examination in part:

> Q. And so in what capacity did you have an opportunity to meet Mr. Rojas?
>
> A. I was asked to evaluate his capacity to proceed, in my role at Broughton Hospital.
>
> Q. And in your evaluation, did you have an opportunity to view his medical records?
>
> A. I did.
>
> Q. And in your capacity to proceed, or view his medical records, did you determine if he had a psychiatric diagnosis?
>
> A. I did.

---

[1] Defendant also argued "the trial court erred by allowing him to waive his right to a jury trial on the existence of aggravated sentencing factors." *Rojas*, 2021 WL 5066762, at *5. We rejected this argument under our Supreme Court's controlling precedent. *See id.* (citing *State v. Hamer*, 377 N.C. 502 (2021)).

Q. And what was that diagnosis?

A. I diagnosed Mr. Rojas with schizophrenia.

. . .

Q. So looking back over Mr. Rojas' medical records, and the situation that was going on, can you give us a general idea of his symptoms of schizophrenia that might have existed in 2016?

A. Well, I can speak to his current symptoms of schizophrenia. The record wasn't sufficiently detailed to describe his symptoms in 2016. . . .

. . .

Q. Well, let me ask you this. In 2016, a crime of great rage and violence occurred. Is it possible that one suffering from schizophrenia, that could contribute to that kind of behavior?

A. Is it possible? If it's possible, broadly—a lot of things— it's certainly possible. But again, I just want to emphasize that I didn't evaluate whether he did in this case. So I can't testify with reasonable medical certainty that it did or did not, but it's certainly possible.

On cross-examination, Dr. Soliman testified in part as follows:

Q. So, Dr. Soliman—and please correct me if I'm wrong with any of my questions, I want to make sure I understood your testimony.

In this particular case with Mr. Rojas, you were looking at one thing specifically, which was his capacity to proceed; is that correct?

A. That is correct.

Q. And with that, I think you kind of indicated it was a snapshot for at that time was he capable to proceed. And with the capacity to proceed you have to look at certain

standards that have been delineated by the Court as to whether or not he can help his attorney with his defense, whether or not he can understand the roles of the different people in the courtroom, things of that nature; is that correct?

A. Yes. All of those are included in the capacity to proceed standard.

Q. All right. And in your report there is not any mention, and none of your testimony can go to how any sort of diagnosis that he may or may not have had could have affected him on May 5th of 2017; is that correct?

A. That's correct. I wasn't asked to evaluate his mental state at the time, so I wasn't asked to evaluate him to offer an opinion on diminished capacity, or an insanity defense.

Defendant also testified on his own behalf at the sentencing hearing. During cross-examination, defendant testified in part as follows:

Q. Mr. Rojas, you have been testifying for about the last 12 minutes; is that correct?

A. Yes. About that, yes.

Q. Okay. And during that whole time you have been blaming Starr for what happened; isn't that right?

A. No, I'm blaming the medication and the negativity in the room and being hallucinating and feeling bothered and not respected, and just—

Q. So you felt bothered and disrespected, and that's why we're here today; is that right?

A. No.

Q. Let's talk about the medications, since you brought that [up].

You indicated that you have been in several hospitals, I

think in New York; is that right?

A. Yes.

Q. Okay. And you know that nobody was ever able to get any sort of records from any of those hospitals; did you know that?

A. I didn't know that. I don't know how long they keep their records, but it's been a while since I started.

Q. Okay. And you told the Court that when you first started dating Starr, and the medication went missing, were you aware that when they searched your home after you murdered your girlfriend they found, like, an entire stack of your antipsychotic medicine, not used, in the storage room?

A. No.

Q. So isn't it true that you were just choosing not to take your medication and using drugs like cocaine instead?

A. No, not at all.

Q. Did you or did you not test positive for cocaine the very next day after you murdered Starr when you went to the hospital?

A. Yeah, that was her drug of choice. And when she would warm me up, I guess, or—that was just her daily routine. You know, like, here I got this for you, just do it. She had took my pain medication from being shot and I needed something to feel a little bit relieved, or something.

Q. Okay. So again, this was Starr's fault that you took cocaine. And instead of going back to the doctor, or going to your mom to get the medication you were supposed to be on, you chose to do an illegal substance instead; is that right?

It's a simple yes or no.

A. Not because of that, no.

During the sentencing proceeding, a jury found the existence of two aggravating factors: the offense was especially heinous, atrocious, or cruel, and defendant took advantage of a position of trust or confidence to commit the offense. The trial court found the existence of three mitigating factors: defendant has a support system in the community; defendant has a positive employment history or is gainfully employed; and defendant has a good treatment prognosis and a workable treatment plan is available.

After finding the aggravating factors outweighed the mitigating factors, the trial court imposed an aggravated sentence of 397 to 489 months imprisonment. Defendant timely appealed to this Court, arguing that the trial court erred in failing to find the statutory mitigating factor that, at the time of the murder, he was suffering from a mental or physical condition that was insufficient to constitute a defense but that nevertheless significantly reduced his culpability for the offense.

## II.  Jurisdiction

> A defendant who has been found guilty, or entered a plea of guilty or no contest to a felony, is entitled to appeal as a matter of right the issue of whether his or her sentence is supported by evidence introduced at the trial and sentencing hearing only if the minimum sentence of imprisonment does not fall within the presumptive range for the defendant's prior record or conviction level and class of offense.

N.C.G.S. § 15A-1444(a1) (2023).  Because defendant pleaded guilty, and because his

minimum sentence of imprisonment does not fall within the presumptive range for his prior record level and class of offense, this Court has jurisdiction over his appeal of right. *See also* N.C.G.S. § 7A-27(b)(4) (2023) ("[A]ppeal lies of right directly to the Court of Appeals . . . [f]rom any other order or judgment of the superior court from which an appeal is authorized by statute.").

## III.    Standard of Review

Generally, "[t]his Court reviews a trial court's decision to sentence outside of the presumptive range for an abuse of discretion." *State v. Davis*, 206 N.C. App. 545, 548 (2010). However, because this case requires us to determine whether the sentencing judge erred in failing to find a statutory mitigating factor, rather than in weighing properly found aggravating and mitigating factors, we review this issue *de novo*. *See State v. Jones*, 309 N.C. 214, 218–20 (1983).

## IV.    Analysis

A sentencing judge must "consider evidence of aggravating or mitigating factors present in the offense that make an aggravated or mitigated sentence appropriate, but the decision to depart from the presumptive range is in the discretion of the court." N.C.G.S. § 15A-1340.16(a) (2023). "The State bears the burden of proving beyond a reasonable doubt that an aggravating factor exists, and the offender bears the burden of proving by a preponderance of the evidence that a mitigating factor exists." *Id.*

"When evidence in support of a particular mitigating or aggravating factor is *uncontradicted, substantial, and there is no reason to doubt its credibility*," a sentencing judge errs in not finding such factor. *Jones*, 309 N.C. at 218–19 (emphasis added).

> Thus, when a defendant argues, as in the case at bar, that the trial court erred in failing to find a mitigating factor proved by uncontradicted evidence, his position is analogous to that of a party with the burden of persuasion seeking a directed verdict. He is asking the court to conclude that the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn, and that the credibility of the evidence is manifest as a matter of law.

*Id.* at 219–20 (cleaned up).

"A trial judge is given wide latitude in determining the existence of . . . mitigating factors, and the trial court's failure to find a mitigating factor is error only when no other reasonable inferences can be drawn from the evidence." *State v. Johnson*, 196 N.C. App. 330, 336 (2009) (quoting *State v. Norman*, 151 N.C. App. 100, 105–06) (2002)). Therefore, "[a]n appellate court may reverse a trial court for failing to find a mitigating factor *only* when the evidence offered in support of that factor is both uncontradicted and manifestly credible." *State v. Mabry*, 217 N.C. App. 465, 471 (2011) (emphasis added) (cleaned up).

Here, defendant argues the trial court erred in failing to find the statutory mitigating factor that, at the time he murdered the victim by stabbing and cutting her over 160 times, he "was suffering from a mental or physical condition that was

insufficient to constitute a defense but significantly reduced [his] culpability for the offense." N.C.G.S. § 15A-1340.16(e)(3). To prevail on this issue, defendant must show he offered evidence in support of this factor which was "uncontradicted, substantial," *Jones*, 309 N.C. at 218, "manifestly credible," *Mabry*, 217 N.C. App. at 471, and from which "no other reasonable inferences can be drawn," *Johnson*, 196 N.C. App. at 336. We conclude defendant has failed to meet this high bar.

Defendant argues Dr. Soliman's testimony provided substantial, uncontradicted, and manifestly credible evidence establishing that: (1) defendant "suffered from the disease of schizophrenia for over twenty years" and (2) "[s]chizophrenia can contribute to crimes such as this one."[2] Defendant's burden, however, was to provide substantial, uncontradicted, and manifestly credible evidence establishing that: (1) he suffered from schizophrenia at the time of the murder and (2) his schizophrenia in fact "significantly reduced [his] culpability" for the murder. N.C.G.S. § 15A-1340.16(e)(3).

Accordingly, our review focuses on whether Dr. Soliman's testimony established that defendant was suffering from schizophrenia at the time of the

---

[2] Defendant also argues that portions of his own testimony provide substantial, uncontradicted, and manifestly credible evidence. However, defendant's testimony does not qualify as the kind of "manifestly credible" evidence relevant to our analysis. Though appellate courts do not ordinarily judge the credibility of witnesses, in this case we must determine whether the credibility of defendant's testimony is "manifest as a matter of law." *Jones*, 309 N.C. at 220 (cleaned up). Considering defendant's history of competency issues, the content of his actual testimony, and his obvious self-interest in the outcome of the re-sentencing hearing, we conclude his testimony was not manifestly credible and therefore did not compel a finding of the mitigating factor under section 15A-1340.16(e)(3).

murder and that such mental condition significantly reduced defendant's culpability. Presuming, without deciding, defendant's evidence established he was suffering from schizophrenia at the time of the murder, Dr. Soliman did not offer substantial and uncontradicted evidence tending to show defendant's schizophrenia significantly reduced his culpability for the offense.

Although Dr. Soliman testified it was "certainly possible" schizophrenia could contribute to the "kind of behavior" defendant displayed when he viciously murdered the victim, he "emphasize[d] that [he] didn't evaluate whether [it] did in this case." Dr. Soliman specifically testified he "wasn't asked to evaluate [defendant's] mental state at the time" of the offense and "wasn't asked to evaluate him to offer an opinion on diminished capacity[.]" Accordingly, Dr. Soliman stated "I can't testify with reasonable medical certainty that it," i.e., defendant's schizophrenia, "did or did not" contribute to the murder.

Our review of the record and transcripts in this case demonstrates that defendant failed to offer substantial, uncontradicted, and manifestly credible evidence that his schizophrenia significantly reduced his culpability for the offense. Defendant's only expert witness could not, and did not, testify with reasonable medical certainty that defendant's schizophrenia contributed to the murder or otherwise significantly reduced defendant's culpability for the offense. Based upon the evidence presented at the re-sentencing hearing, the sentencing judge did not err in failing to find defendant's proposed mitigating factor under section 15A-

1340.16(e)(3) or in imposing an aggravated sentence of 397 to 489 months imprisonment.

## V. Conclusion

An appellate court may reverse a trial court's decision not to find a mitigating factor only if the evidence supporting such factor is substantial, uncontradicted, and manifestly credible. Because defendant failed to present substantial, uncontradicted, and manifestly credible evidence supporting his proposed mitigating factor under section 15A-1340.16(e), the trial court did not err in failing to find that mitigating factor.

NO ERROR.

Judges TYSON and CARPENTER concur.